AES/DCP:KTF:BLW/DIB
F. #2024R00288

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

AMMAR AWAWDEH,
TIMOTHY MCCORMACK,
MAHMUD MOLLAH, and
LONG PHI PHAM
     also known as "Bruce,"

                      Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

**TO BE FILED UNDER SEAL**

<u>COMPLAINT AND AFFIDAVIT IN SUPPORT OF APPLICATION FOR ARREST WARRANTS</u>

(18 U.S.C. §§ 1349 and 3551 <u>et</u> <u>seq</u>.)

Cr. Case No. 24-MJ-404

EASTERN DISTRICT OF NEW YORK, SS:

        DOMINIC MARIANI, being duly sworn, deposes and states that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), duly appointed according to law and acting as such.

        In or about and between January 2024 and the present, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants AMMAR AWAWDEH, TIMOTHY MCCORMACK, MAHMUD MOLLAH and LONG PHI PHAM, also known as "Bruce," together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud Betting Company 1, an online sports betting company the identity of which is known to your affiant, and to obtain money and property from Betting Company 1 by means of one or more materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate

and foreign commerce writings, signs, signals, pictures and sounds, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

The source of your deponent's information and the grounds for his belief are as follows:[1]

1. I am a Special Agent with the FBI and have been involved in the investigation of numerous cases involving wire fraud, wire fraud conspiracy and illegal gambling. I am familiar with the facts and circumstances set forth below from, among other things, my participation in the investigation; my review of the investigative file; and from reports of other law enforcement officers involved in the investigation.

I. Relevant Individuals and Entities

2. The defendant AMMAR AWAWDEH was a citizen of the United States and a resident of Brooklyn, New York.

3. The defendant TIMOTHY MCCORMACK was a citizen of the United States and a resident of New York, New York.

4. The defendant MAHMUD MOLLAH was a citizen of the United States and a resident of Lansdale, Pennsylvania.

5. The defendant LONG PHI PHAM, also known as "Bruce," was born in Vietnam. He was a citizen of the United States and a resident of Brooklyn, New York.

6. The National Basketball Association ("NBA") was a professional basketball league in North America comprised of 30 teams. The NBA maintained a code of

---

[1] Because the purpose of this Complaint is to set forth only those facts necessary to establish probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware.

2

conduct applicable to its players and which, among other things, prohibited wagering in connection with NBA games.

7. Player 1, an individual whose identity is known to me, was a citizen of the United States. During the 2023-2024 season, Player 1 was a professional basketball player in the NBA. Among others, he played in NBA games that took place on January 26, 2024 (the "January 26 Game") and March 20, 2024 (the "March 20 Game").

8. Betting Company 1, the identity of which is known to me, was a sportsbook that operated both physical sportsbooks and an online platform that offer sports betting relating to, among other things, NBA games and individual players' statistical performances in connection with NBA games. Betting Company 1 operated a physical sportsbook within a hotel & casino (the "Casino") in Atlantic City, New Jersey.

9. Betting Company 2, the identity of which is known to me, was a sportsbook that operated both physical sportsbooks and an online platform that offer sports betting relating to, among other things, NBA games and individual players' statistical performances in connection with NBA games.

10. Since 2021, Betting Company 1 and Betting Company 2 (collectively, the "Betting Companies") have been the co-official sports betting partners of the NBA.

II. Background on Sports Betting

11. In 1992, following several high-profile sports-betting scandals, Congress passed the federal Professional and Amateur Sports Protection Act ("PASPA"), 28 U.S.C. § 3702, which banned all but four states from sponsoring, authorizing, operating, or regulating sports wagering. The four excepted states—Nevada, Oregon, Delaware and Montana—had existing sports wagering regimes that PASPA grandfathered in.

12. In May of 2018, following years of litigation between the State of New Jersey—which desired to legalize sports betting—and several major American professional and college sports leagues, the United States Supreme Court struck down PASPA as unconstitutional. In the ensuing six years, sports betting, and particularly online sports betting, became legal in over 35 states.

13. In recent years, online sportsbooks like Betting Company 1 and Betting Company 2 made it possible for bettors to open an online account and place wagers using their phone. Bettors could generally wager on the moneyline, spread, over/under, parlays, props and futures.

14. A "prop," or proposition bet, was a bet placed on an individual player's performance, rather than on the outcome of the game. A prop was a bet made regarding the occurrence or non-occurrence during a game of an event not directly affecting the game's final outcome. For example, a betting platform could offer users a wager that a certain player would score more (referred to as betting the "over") or fewer (referred to as betting the "under") points than a certain number of points designated by the betting platform for a given game. In addition to adult professional athletes who compete on team sports like Player 1, prop bets could be placed on college students, individual athletes, and child professional athletes (i.e., professional athletes who are under the age of 18).

15. A "parlay" bet or a "parlay" was a bet comprised of two or more individual bets. In order for a bettor to win a parlay, each bet, or "leg," within the parlay had to win.

16. A moneyline bet was a wager placed on a game's outcome.

4

17. A futures bet was a bet on the outcome of a multi-stage event such as a season or a tournament. Futures could refer to either team or player markets, such as which team would win their division, league, or championship, as well as which player would win league MVP or Rookie of the Year.

18. Before placing any bet, all bettors wagering through Betting Company 1 and Betting Company 2 had to agree to their respective terms of use (the "Terms of Use"), which both provided, in sum, substance and in part, that users were prohibited from wagering in connection with sports contests or individual players' statistical performances if the users had access to any pre-release, confidential information or other information that was not available to all other wagerers, including any information provided by a professional athlete, such as non-public injury information. The Terms of Use also prohibited individuals from using other individuals' accounts to place wagers.

III. The Fraudulent Scheme[2]

A. Summary

19. As described more fully below, the defendants AMMAR AWAWDEH, TIMOTHY MCCORMACK, MAHMUD MOLLAH and LONG PHI PHAM conspired to place "under" prop bets on Player 1's performance in the January 26 and March 20 Games, knowing in

---

[2] The evidence described below was obtained through a number of sources, including but not limited to search warrants of cellular phones; betting records obtained from Betting Company 1 and Betting Company 2; surveillance footage obtained from the Casino; and records obtained from peer-to-peer payment applications such as Venmo, Paypal, Zelle and Apple Cash.

advance that Player 1 planned to withdraw from those games for purported health reasons, thus rendering those under prop bets successful.[3]

B. The January 26 Game

20. As demonstrated in text messages, cell phone application records, and wire transfer records, among other evidence, by the beginning of 2024, Player 1 had amassed significant gambling debts to, among others, the defendant AMMAR AWAWDEH. AWAWDEH encouraged Player 1 to clear those debts by engaging in the Player 1 "special," i.e., withdrawing from certain games prematurely to ensure that under prop bets on Player 1's performance were successful.

21. In or about early 2024, using the messaging application Telegram, the defendant AMMAR AWAWDEH sent a text message to Player 1 that stated, "Screenshot this . . . . Me ammar awawdeh born 7/23.1991 is forcing [Player 1] to do this." In response, Player 1 wrote: "If I don't do a special with your terms. Then it's up. And u hate me and if I don't get u 8k by Friday you're coming to Toronto to beat me up." Based on my training and experience, and knowledge of the facts of this investigation, I believe these messages refer to AWAWDEH's efforts to persuade Player 1 to limit his own game participation in order to positively influence the outcome of AWAWDEH's and other co-conspirators' under prop bets on Player 1's game performance.

22. On January 22, 2024—four days before the January 26 Game—Player 1 sustained a purported eye injury during a game. Player 1 was evaluated by a doctor after this

---

[3] The evidence indicates that, unlike the other co-conspirators, MOLLAH was only involved in betting on the March 20 Game.

6

game and diagnosed with a corneal abrasion. However, he did not subsequently complain about the purported injury and was not placed on the NBA's injury list.

23. According to Player 1, shortly before the January 26 Game, Player 1 communicated with the defendants AMMAR AWAWDEH and LONG PHI PHAM in a Telegram group chat. In the Telegram chat, Player 1 told AWAWDEH and PHAM that he would be removing himself early from the January 26 Game, claiming that he was injured.[4]

24. Player 1 was not on the NBA's injury list prior to the January 26 Game. Player 1 entered the January 26 Game midway through the first quarter. After playing just four minutes (approximately 30% of his 2023-2024 NBA season average) and recording zero points, three rebounds and one assist, Player 1 removed himself from the game after he complained to team officials that he reaggravated the above-described eye injury. Video footage of the January 26 Game neither shows any contact with Player 1's eyes, nor any apparent reaggravation of the eye injury. Player 1 did not subsequently complain to team officials about the purported eye injury after the January 26 Game and played in his team's next game two days later.

25. Player 1's performance in several statistical categories during the January 26 Game was under the designated amounts set by Betting Company 1 in its prop bets related to Player 1. Thus, several bettors who wagered the "under" on prop bets related to Player 1's performance for the January 26 Game won those bets. Among the successful "under" bets placed on prop bets related to Player 1's performance for the January 26 Game were the following:

---

[4] Player 1 spoke to law enforcement with the hope of entering into a cooperation agreement and receiving leniency at sentencing in the event he is criminally charged. Player 1 has admitted to committing the crimes described herein. Player 1's information has been corroborated by other evidence, some of which is set forth herein.

      i. A relative of the defendant AMMAR AWAWDEH (the "Awawdeh Relative"), whose identity is known to me, placed a $10,000 parlay bet through Betting Company 1 on the "under" for Player 1's three pointers, assists and steals. As a result of Player 1 removing himself from the January 26 Game, the bet was successful and the Awawdeh Relative won $85,000 (netting a profit of $75,000).

      ii. The defendant TIMOTHY MCCORMACK placed a $7,000 parlay bet through Betting Company 1 on the "under" for Player 1's three pointers, points, assists and rebounds. As a result of Player 1 removing himself from the January 26 Game, the bet was successful and MCCORMACK won $40,250 (netting a profit of $33,250).

C. <u>The March 20 Game</u>

26. On March 17, 2024, Player 1 played one of his best games of the season, playing 20 minutes and recording seven rebounds (tied for his highest rebounding output of the 2023-2024 NBA season). In the following days, Player 1 told team officials, various family members and a friend that he started feeling symptoms of an illness consistent with food poisoning. Nevertheless, Player 1 played in his team's next game (the March 20 Game).

27. According to Player 1, prior to the March 20 Game, the defendants AMMAR AWAWDEH, MAHMUD MOLLAH, LONG PHI PHAM and Player 1 communicated together in a Telegram group chat. In the Telegram chat, Player 1 told AWAWDEH, MOLLAH and PHAM that he would be removing himself early from the March 20 Game, claiming that he was ill. Also in the Telegram chat, the group agreed on a profit-sharing agreement for money won on successful "under" bets placed on Player 1. The agreement contemplated, in sum and substance, that AWAWDEH, MOLLAH, PHAM and Player 1 would each approximately receive 24% of the profits and MCCORMACK would receive approximately 4% of the profits.

28. On March 20, 2024, the defendants AMMAR AWAWDEH, TIMOTHY MCCORMACK, MAHMUD MOLLAH and LONG PHI PHAM all met at the Casino in Atlantic City to place bets on Player 1. Surveillance footage from the Casino and photographs stored on

8

certain of the co-conspirators' iPhones show AWAWDEH, MCCORMACK, MOLLAH and PHAM together at the Casino. Below is a photo showing MOLLAH (pictured in the foreground, in a tan coat), AWAWDEH (pictured on the left in a red hooded sweatshirt and black jacket), PHAM (pictured in the back in a t-shirt) and MCCORMACK (pictured in a baseball cap and a black jacket) sitting together on March 20, 2024 at a restaurant in the Casino.



29. On March 20, 2024, the defendant MAHMUD MOLLAH placed the first of his several bets on Player 1 at approximately 7:24 p.m. EST. Shortly before making that bet, MOLLAH deposited $66,900 in cash into his account with Betting Company 1 at approximately 6:37 p.m. EST. Surveillance footage from the Casino shows MOLLAH and the defendant AMMAR AWAWDEH walking up to the teller together, with MOLLAH holding a blue gift bag containing cash, just moments before MOLLAH made that deposit into his account.

30. Between approximately 3:23 p.m. EST and 4:34 p.m. EST on March 20, 2024, the Awawdeh Relative (who won $85,000 on a bet on Player 1 in the January 26 Game)

9

made a transfer to the defendant TIMOTHY MCCORMACK of $65,000 and then attempted to transfer $25,000 to MCCORMACK, which was denied by PayPal. MCCORMACK then transferred $74,300 from his PayPal account to his account at Betting Company 1 that same day.

31. During the March 20 Game, after playing just three minutes (less than 30% of his 2023-2024 NBA season average), and recording zero points, two rebounds and zero assists, Player 1 removed himself from the game after he complained to team officials of feeling ill. Player 1 did not reenter the game. Player 1 was not subsequently placed on the NBA's injury list and played in his team's next game on March 22, 2024.

32. Player 1's performance in many statistical categories during the March 20 Game was under the designated amounts set by Betting Company 1 in its prop bets related to Player 1. Thus, several bettors who wagered the "under" on prop bets related to Player 1's performance for the March 20 Game won those bets. Among the successful "under" bets placed on prop bets related to Player 1's performance for the March 20 Game were the following:

    i. The defendant TIMOTHY MCCORMACK wagered $8,000 through Betting Company 1 on the "under" for Player 1's rebounds. As a result of Player 1 removing himself from the March 20 Game, the bet was successful and MCCORMACK won $44,000 (netting a profit of $36,000).

    ii. The defendant MAHMUD MOLLAH wagered $10,000 through Betting Company 1 on the "under" for Player 1's assists. As a result of Player 1 removing himself from the March 20 Game, the bet was successful and MOLLAH won $42,000 (netting a profit of $32,000).

    iii. The defendant MAHMUD MOLLAH placed an $80,000 parlay bet through Betting Company 1 on the "under" for Player 1's assists, rebounds, points, three pointers, steals and blocks. As a result of Player 1 removing himself from the March 20 Game, the bet was successful and MOLLAH won $1,120,000 (netting a profit of $1,040,000).

    iv. The defendant MAHMUD MOLLAH placed three separate $500 parlay bets through Betting Company 1 on the "under" for Player 1's

          assists, rebounds, points, three pointers, steals and blocks. As a result of Player 1 removing himself from the March 20 Game, the bets were successful and MOLLAH won $21,500 (netting a profit of $20,000).

    v.    The defendant MAHMUD MOLLAH placed a $9,400 parlay bet through Betting Company 1 on the "under" for Player 1's blocks, points and assists. As a result of Player 1 removing himself from the March 20 Game, the bet was successful and MOLLAH won $44,650 (netting a profit of $35,250).

    vi.    The defendant MAHMUD MOLLAH placed two separate $500 parlay bets through Betting Company 1 on the "under" for Player 1's assists, rebounds, points and blocks. As a result of Player 1 removing himself from the March 20 Game, the bets were successful and MOLLAH won $5,375 (netting a profit of $4,375).

Geolocation data confirmed that the accounts through which the above-described wagers were made were logged into from the Casino shortly before the above-described wagers were made.

    33.    Due to the suspicious nature of the wagers described above, Betting Company 1 suspended the defendant MAHMUD MOLLAH's account after MOLLAH placed the bets on Player 1's performance on March 20, 2024 and before MOLLAH could withdraw the majority of the winnings.

    34.    After the January 26 and March 20 Games, the Betting Companies reported the suspicious prop bets described above to the International Betting Integrity Association ("IBIA"), which reported the activity to the FBI. The Betting Companies also reported the suspicious betting activity to the NBA, which opened an investigation regarding Player 1 and the nature and circumstances surrounding the above-described wagers.

    35.    On April 4, 2024, in a group chat between Player 1 and the defendants AMMAR AWAWDEH, MAHMUD MOLLAH and LONG PHI PHAM, Player 1 wrote to the group that they "might just get hit w a rico" and asked if the group chat participants had "delete[d] all the stuff" from their personal cell phones. Based on the government's

investigation and my professional experience and background, I believe these messages refer to Player 1's concerns that he and certain of the co-conspirators would be criminally investigated for, among other things, violations of the Racketeer Influenced and Corrupt Organizations Act, and needed to delete any evidence on their personal cell phones.

36. On April 10, 2024, the defendant AMMAR AWAWDEH sent a text message to the defendant MAHMUD MOLLAH stating: "I really need you to hound [Betting Company 1]. At least get me back my principle $." Based on my training and experience, and my knowledge of the facts of this investigation, I believe this message from AWAWDEH to MOLLAH refers to the fact that Betting Company 1 suspended MOLLAH's account after MOLLAH placed the bets on Player 1's performance on March 20, 2024. Further, this text message indicates that AWAWDEH provided MOLLAH with the cash that MOLLAH used to place the bets on Player 1's performance.

37. Following its investigation, the NBA permanently banned Player 1 from the NBA. Among other things, the NBA reported in a press release that "[t]he league's investigation found that prior to the . . . March 20 game, [Player 1] disclosed confidential information about his own health status to an individual he knew to be an NBA bettor . . . . The league's investigation also found that [Player 1] limited his own game participation to influence the outcome of one or more bets on his performance in at least one [NBA] game. In the March 20 game, [Player 1] played only three minutes, claiming that he felt ill."

IV. The Defendant LONG PHI PHAM's Attempted Flight to Australia

38. On May 31, 2024, one day after the government attempted to question the defendant TIMOTHY MCCORMACK, the defendant LONG PHI PHAM booked a one-way airplane ticket to Australia. On June 3, 2024, law enforcement officers apprehended PHAM at

John F. Kennedy International Airport as PHAM prepared to board the flight. PHAM had in his possession, among other things, approximately $12,000 in cash; two cashier's checks totaling $80,000; a series of betting slips; and three cellular phones.

      WHEREFORE, your deponent respectfully requests that the defendants AMMAR AWAWDEH, TIMOTHY MCCORMACK, MAHMUD MOLLAH and LONG PHI PHAM be dealt with according to law.

/s Dominic Mariani
_____
DOMINIC MARIANI
Special Agent
Federal Bureau of Investigation

Sworn to before me telephonically this _4th_ day of June, 2024

*Cheryl Pollak*
_____
THE HONORABLE CHERYL L. POLLAK
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK